Case 1:04-cv-00421-T Document 16 Filed 02/16/2005 Page 1 of 41

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| IKE WEEMS, | : | |
| Petitioner | : | C.A. No. 04-421T |
| v. | : | |
| UNITED STATES OF AMERICA, | : | |
| Respondent | : | |

**PETITIONERS REPLY TO UNITED STATES OBJECTION TO DEFENDANTS MOTION TO VACATE, SET ASIDE AND/OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255**

Now comes petitioner, Ike Weems, pro-se, and rebuts United States objection to defendants motion to vacate, set aside, and/or correct sentence pursuant to 28 U.S.C. § 2255 for the reasons set forth in the accompanying memorandum.

Respectfully submitted

I. Weem

Ike Weems, Pro-se
U.S.P. Big Sandy
P.O. Box 2068
Inez, Ky 41224

DATE: 2-13-05

16

Case 1:04-cv-00421-T Document 16 Filed 02/16/2005 Page 2 of 41

Certificate of Service

I hereby certify that on the 13th of Feb., 2005, I forwarded a copy of petitioners reply to United States objection to defendants motion to vacate, set aside and/or correct sentence pursuant to 28 U.S.C. § 2255 and supporting memorandum, by postal mail, to:

Dulce Donovan
Assistant U.S. Attorney
50 Kennedy Plaza
8th Floor
Providence, R.I. 02903

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF RHODE ISLAND

IKE WEEMS, :
Petitioner :
v :
UNITED STATES OF AMERICA, :
Respondent :

MEMORANDUM OF LAW REBUTTING UNITED STATES' OBJECTION TO DEFENDANTS MOTION TO VACATE, SET ASIDE AND/OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

## I. PROCEDURAL HISTORY

On December 20, 2000, a grand jury returned an indictment charging that from an unknown time through December 11, 2000, Petitioner Ike Weems (aka "True"), a previously-convicted felon, possessed a .45 caliber/410 gauge revolver (a revolver that fired shotgun shells), in violation of 18 U.S.C. § 922(g) (1). In July 2001, a jury deliberate for two days but could not reach a verdict. By agreement of the parties, the Court declared a mistrial.

Seeking to avoid retrial, Weems appealed. The First Circuit held: "Since the record in this case makes clear that defendant consented to the declaration of a mistrial, this appeal is without merit and the motion to dismiss is granted." (8/23/01 Order in Case No. 01-2080.)

On October 19, 2001, a second jury convicted Weems. On March 8, 2002, the Court sentenced him to 282 months of imprisonment.

Weems timely appealed to the First Circuit and his conviction and sentence were affirmed. United States v Weems, 322 F.3d 18 (1st Cir. 2003). Weems

petitioned the Supreme Court of the United States for a writ of certiorari which the Court denied on October 14, 2003. Weems timely filed the instant § 2255 motion on October 1, 2004.

II. THE LAW GOVERNING WEEMS' ENTITLEMENT TO A HEARING

The third paragraph of 28 U.S.C. § 2255 provides in pertinent part that unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues, and make findings of fact and conclusion of law with respect thereto.

Also, Weems is entitled to an evidentiary hearing. Due to the fact that his ineffective assistance counsel claims are not necessarily conclusively refuted by the files and records of the case, then an evidentiary hearing should be held. Even though the United States attorney states that trial counsel's alleged ineffectiveness, was in fact the opposite, and stemmed from trial strategy, neither party's claims can be determined to be adequate, just by a review of the files and records of the case. Concrete acts and omissions by counsel cannot be merely presumed to be merely strategy. Thus, a hearing should be conducted to properly interview the the trial attorney, so that the trial judge can properly assess the trial counsel's intentions, demeanor, thoughts, his understanding of the law and its application in relation to the facts. This way he can be impartial and determine the validity and merit of Weems' claims.

Furthermore, the Supreme Court has declared that the scope of the hearing under 28 U.S.C.S. § 2255 is not strictly limited by the allegations of the motion.

According to a dictum in Sanders v United States (1963), 373 US1, 10 L Ed 2d 148, 83 S.CT 1068, the trial judge is not required to limit his decision on the first motion under 28 U.S.C.S. § 2255 to the grounds narrowly alleged, or to deny the motion out of hand because the allegations are vague, conclusory, or inartistically expressed, but is free to adopt any appropriate means for inquiry into the legality of the prisoner's detention in order to ascertain all possible grounds upon which the prisoner might claim to be entitled to relief and to spread the disposition of all grounds for relief on the files and records of the case.

Furthermore, the Supreme Court said that a hearing is required where it can not be concluded, with the assurance required by the statutory "conclusively show" standard, that under no circumstances could the petitioner establish facts warranting relief under 28 U.S.C.S. § 2255. (See Fontaine v United States (1973), 411 us 213,36 L. Ed 2d 169, 93 S. Ct 1461). Since the aforementioned conclusion cannot be made, then an evidentiary hearing is required.

Finally, section 2255 provides that a petitioner is entitled to an evidentiary hearing "unless the motion and the files and the records of the case conclusively show that the prisoner is not entitled to relief." Accordingly, "a petition can be dismissed without a hearing if the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or if the allegations cannot be accepted as true because "they are contradicted by the cecord, inherently incredible, or conclusions rather than statements of fact." (See Dzurgot v Luther, 897 F. 2d 1222, 1225 (1st Cir. 1990) (quoting Myatt v United States, 875 F. 2d 8, 11 (1st Cir. 1989)).

In the instant matter, Weems submitted an affidavit (See EXB. B of original 2255 petition form), stating how he instructed his attorney not to agree to mistrial, prior to the in chambers conference. Because these claims actually

transpired outside of the purview of the Court, neither the record not the Court can refute Weems' claims. "...[S]ince these allegations evolve around matters outside the record, they could not be dismissed without a hearing on the ground that they conclusively contradicted by the record." U.S. v Rodriguez, 929 F. 2d 747 at 752 (C.A.1 (Puerto Rico) 1991). Nothing in Weems' claims are inherently incredible, conclusory, neither can it be concluded, with the assurance required by the statutory "conclusively show" standard, that under no circumstances could Weems establish facts warranting relief under 28 U.S.C.S. § 225. Also, the United States attorney disputes the facts of Weems' claims, and the primary purpose of an evidentiary hearing is to resolve such factual disputes. Finally, even though the district judge can refer to his prior personal observations recollections, the same can not be true for events that took place outside of his courtroom or private chambers, as some of the claims that Weems presents are based on. Thus, an evidentiary hearing is required. (See Attach D)

III. FACTS

A. Evidence at the first trial

At Weems first trial, the Government presented three witnesses, Agents Troiano and O'Shaughnessy of the Bureau of Alcohol, Tobacco and firearms, and officer Constantino of the Providence Police department. Agents Troiano and O'Shaughnessy both participated in the apprehension of Weems, but officer Constantino testified only about his unsuccessful efforts to obtain fingerprints from the seized weapon. The defense also presented witnesses, they do not affect the Judgement of Acquittal analysis.

Officer Troiano was the lead agent in the case and described what happened. Law enforcement officers surrounded 11 Padelford Street, Providence, Rhode Island. One of the officers observed Weems stick part of his body out of rear window. Tr. of July 17, 2001, at 34. The officers thereafter entered through

the front door, having obtained the key from the tenant who happened upon the scene. Tr. of July 17, 2001, at 36. The officers did an immediate sweep of the unit and found nothing. Tr. of July 17, 2001, at 36. On cross examination Agent Troiano testified the officers entered the bedroom where the defendant was eventually captured, looked under the bed, but did not move the bed Tr. of July 17, 2001, at 85. Thereafter, law enforcement officers stayed inside the 11 Padelford Street residence, looking for Petitioner. At one point, the officers hear footsteps from the attic. Tr. of July 17, 2001, at 38. For a period of 15 to 20 minutes, they continue to yell for the defendant to come down from the attic, to no avail. Tr. of July 17, 2001, at 39.

Once Petitioner's foot and leg came down through the plaster of the ceiling, but he pulls himself back in to attic and the process of entreating him to come down continues. Tr. of July 17, 2001, at 39. Some minutes later, the law enforcement officials hear more pounding, but from a different location, leading to the belief that Weems was attempting to escape by trying to get into the attic of the adjacent duplex apartment. Tr. of July 17, 2001, at 39. There then appears to be more walking around in the attic and pepper spray is used to try to get Weems out of attic. Tr. of July 17, 2001, at 40. There is more pounding in the attic and again Weems feet and legs break through the ceiling. Tr. July, 2001, at 40. This time the officers successfully grab Weems and pull him through the ceiling. Tr. of July 17, 2001, at 40.

Agent Troiano testified that Weems resisted being pulled down. Tr. of July 17, 2001, at 40. He stated on cross examination that when pulling Weems down, particular attention was paid to Weems hands, for the obvious safety reason, Tr. of July, 2001, at 90-91. He said that as Weems was being pulled down, Weems hands were still up in the attic, he imagined grabbing the beams, Tr. of July 17, 2001, at 91. Agent O'Shaughnessy testified that all the officers were using flashlights. Tr. of July 17, 2001, at 147. Agent Troiano

testified Weems landed on the bed and the struggle continued. Weems had his hands underneath his body and would not put them behind his back. Eventually, his hands were put behind his back and he was handcuffed. Tr. of July 17, 2001, at 41. He landed face down. Tr. of July 17, 2001, at 93. He was then made to stand up and moved out of the immediate area to doorway of the bedroom where he had fallen. Tr. July 17, 2001, at 41-42.

Agent Troiano testified that as he and another officer were moving Weems out of the room, he heard someone say "there's a gun." He said he looked and observed a gun on the bed, which was somewhat ajar. Tr. of July, 17, 2001, at 42. On cross examination, he testified as to the location of the gun that was found. He testified that the mattress had moved during the course of the struggle and the pistol was sitting on the box spring, towards the foot, rather than the front of the bed. Tr. of July 17, 2001, at 96, 105. Agent O'Shaughnessy testified Weems fell across the bed, as opposed to long ways, the way a person would sleep. tr. of July 17, 2001, at 144.

Agent Troiano testified that the gun was not immediately seized because the agents did not have their evidence kit with them. Tr. of July 17, 2001, at 45-46. Agent O'Shaughnessy had to retrieve it, which took about 30 to 40 minutes. Tr. of July 17, 2001, at 46.

Agent Troiano testified that he never saw Weems with the gun on his person and he never saw the pistol fall from the ceiling. Tr. of July 17, 2001, at 104. He also testified that he was not aware of any other police officers who observed the gun fall from Weems or saw it fall from the ceiling. Agent Troiano also testified that he was not aware of any other police officers who felt the gun on Weems as they pulled him from ceiling. Tr. of July 17, 2001, at 1041. He also testified no one moved bed prior to Weems Falling onto bed from ceiling. Tr. of July 17, 2001, at 85. The bed was still in place prior to petitioners

fall. Tr. of July 17, 2001, at 86. The Mattress became ajar during struggle between officers and petitioner. Tr. of July 17, 2001, at 42, 43, 105. Agent O'Shaughnessy also testified he grabbed Weems waist and leg when pulling Weems from ceiling and didn't feel gun. Tr. of July 17, 2001, at 144, 147.

Agent O'Shaughnessy also testified that he never saw a gun come out of the ceiling, or a gun on Weems. Agent Troiano also testified the first time he saw gun was on boxspring after Weems was arrested Tr. of July 17, 2001, at 104. He also testified no facts at the trial indicated gun wasn't on boxspring before Weems fell from ceiling.

In sum, the evidence produced by the Government at the first trial was legally insufficient and failed to establish that; firearm was on Weems person, anyone ever saw Weems with firearm, Weems was ever at house on any other day than December 11, 2001, Weems had ever lived or stayed at house before, Weems had any clothes in house, Weems had any documents in house, ie., identifycation, Drivers license, birth certificate, phone bills, etc., Weems was ever in bedroom where gun was found prior to fall from ceiling, Weems fingerprints were on firearm, Weems made statements in regards to firearm, Weems even had knowledge that firearm existed.

In response to Governments statement "despite numerous attempts by the officers to get Weems to surrender, he refused to do so and indeed made several desperate escape attempts, all of which indicated consciousness of his own guilt". (Memorandum of law by Government pg #6) The fact that Weems was trying to escape in the attic isn't sufficient evidence to find him guilty of anything found between the mattress in the bedroom of somebody else's house. In fact, at the close of Governments case, the Jury doesn't even have an idea on why or how Weems got in house. All the Jury know is Agent got a call Weems was inside house and Weems had arrest warrant for probation violation for failure

to report. Here's a hypothetical situation of equivalent legal evidence: Agents get a call that a guy named Sam is at 11 Padelford Street, Sam is wanted for probation violation for failure to appear, Agents and officers descend upon house and see Sam in back window, Agents obtain key from tenant who states she doesn't know anyone named Sam and enter house, Agents open front door and come in one by one, there's about 8 Agents and officers. They do a protective sweep of entire house and see no one. In the middle of the living room, the room they are first in as they enter, have 4 large boxes stacked on top of each other beside a couch. The front doors remained open which concealed from view a small closet which Sam is hiding. After making two protective sweeps and not finding Sam, Sam burst out of the closet and tries to escape out the back door in the living room. Agents and officers tackle Sam and they fall onto the 4 boxes. Sam falls face down and his hands are beneath him, he resist letting the officers cuff him but they eventually get his hands behind him, handcuff him and stand him up. One of the officers yell, "There's a gun." The Agent sees a gun and drugs laying on top of some clothes inside one of the boxes, the box from which was under Sam's body when he was handcuff and lifted up. The top flap came open in the struggle. ON THIS EVIDENCE ALONE, DOES SAM TURN FROM A PROBATION VIOLATOR TRYING TO ESCAPE TO AN OWNER OF WHATEVER IS FOUND BETWEEN THE BOXES? BASED ON THESE FACTS, IS THE EVIDENCE LEGALLY SUFFICIENT TO FIND SAM GUILTY OF POSSESSION OF THIS GUN AND DRUGS? Whose house is it? Whose boxes?

Evidence introduced by government at Petitioner's first trial was legally insufficient. Defense witness do not affect the Judgement of Acquittal Analysis at the close of Government's case. The evidence presented at this juncture only pointed to Petitioner being arrested in the same room where a gun was between mattress, not that Petitioner knowingly possessed anything found on boxspring.

B. Evidence at the second trial

At the second trial, the Government established the same basic sequence of events, from the arrival of the officers at 11 Padelford through Weems escape attempts , his ultimate capture after being pulled through the ceiling and onto the bed, and the discovery of the firearm on the boxspring. Tr. of Oct. 15, 2001, at 42-68, Tr. of Oct. 18, 2001, 19-29. This time, however, the Government recognizing its negligent evidence at first trial added four aspects.

First, Katisha Smith Testified that: (1) she rented 11 Padelfore; (2) for about four of five months prior to December 11, 2000, Weems had paid her $120 per month to store clothes at the apartment and spent the night there occasionally; (3) Weems had keys to the apartment and came and went as he pleased; (4) She did not own any firearms; and (5) She had never seen the shot-gun revolver before. Tr. of Oct. 15, 2001, 161-63, 169-70.

Second, Christopher Macon testified that; (1) on December 11, 2000, he saw Weems at 11 Padelford with the shotgun revolver and (2) he saw Weems with the same gun within the prior month, also at 11 Padelford. Tr. of Oct. 16, 2001, 5-9 and 17-21. Agent Troiano testified that Macon had reported the December 11 incident to him the same day, before the arrest. Tr. of Oct. 15, 2001, 44-45, 56, 127-29.

Third, officer O,Shaughnessey testified that during the Security Sweep that proceeded Weems arrest, and while checking to make sure that no one was hiding under the bed, he actually picked up the boxspring and mattress. As he did so, he slid the mattress to one side to get a better grip on the box spring. Tr. of Oct. 18, 2001, 21-22, 33-36, 43, 45. He did not notice any gun there at the time. Tr. of Oct. 18, 2001, at 25.

Fourth, on cross-examination, Agent Trojano testified that Macon had told him that he had seen Weems carrying the shotgun revolver on November 6, 2000, while Weems was in car with Russuel Yates. Tr. of Oct. 15, 2001, 129-30, 138-39, 142-43.

IV. ISSUES

In Petitioners Motion to Vacate, Set Aside, and/or Correct Sentence Pursuant to 28 U.S.C. § 2255, Petitioner raises fourteen issues, twelve of which relate to his trial counsels ineffectiveness. (Ground three also relates to the courts abuse of discretion in declaring mistrial) Petitioner claims Ineffective Assistance of Counsel when; (1) his counsel failed to argue issues on insufficiency of evidence to prove constructive possession during rule 29 hearing which would have showed United States Government arguments were erroneous; (2) His counsel consented to a hung Jury over his objections at the first trial and made mistatements of law and fact; (3) his counsel slept during direct-examination of Christopher Macon; (4) Counsel never objected to United States Marshals' restraining Weems and escorting him to cell block area in presence of Jury following his counsel fainting at trial; (5) counsel failed to impeach Macon's credibility; (6) The court failed to conduct a competency hearing after Weems counsel fainted; (7) His counsel incorrectly advised him that Macon would not be permitted to testify at the second trial; (8) His counsel failed to report to the court that a Juror was sleeping; (9) His counsel failed to request a Franks hearing related to Agent Troiano and Christopher Macon; (10) His counsel failed to object to Jury Instructions on constructive possession and evidence relating to search; (11) His counsel failed to call important facts witness who would have shown petitioners actual innocence, and after counsel fainted, he failed to cross-examine trial witness on important facts which were exculpatory and would have shown petitioners actual innocence; (12) His counsel

failed to seek to overturn Petitioner's 1998 assault conviction. Petitioner also claims that his conviction was obtained by evidence gained in violation of the Fourth Amendment and that his conviction was enhanced based on convictions which were not proven to a Jury.

For all of the reasons articulated below, Petitioner's Motion should be granted.

V. Argument

A. Weems is Entitled to relief under 28 U.S.C. § 2255

Weems filed his motion to vacate, set aside or correct sentence pursuant to 28 U.S.C.S. § 2255 which states in pertinent part:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence imposed was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence. (28 U.S.C. § 2255).

A motion under 28 U.S.C. § 2255 is a substitute for habeas corpus. Relief is available under this section only if the same relief is available under the writ (Hill v. United States, 368 U.S. 424, 427 (1962)). The ground justifying relief under § 2255 are limited. Nevertheless, "illustrative of instances in which the writ of habeas corpus has been used to review convictions in Federal courts either without consideration of the adequacy of relief by appeal or where an appeal would have afforded an adequate remedy, are those where the conviction... where the trial or sentence violated specific constitutional guaranties." (See Sunal v Large, 91 L. Ed. 1982, 332 US 174 at 179).

In the instant case, Weems had his constitutional right to be tried by one tribunal, waived without his consent, by his trial attorney. There was no showing of "manifest necessity" declared by the Court, and Weems' attorney's non consensual waiver of is double jeopardy rights, resulted in a trial being terminated without Weems' consent or without the trial judge doing everything in his discretionary power to ensure that the trial resulted in a verdict. This unconstitutional and unprofessional waiver of Weems' trial attorney's client's rights, ended up being the cause of him facing double jeopardy in a second trial. Furthermore, since the trial judge did nothing to prevent a mistrial, he in turn, was an accessory to the violation of Weems' constitutional protection against double jeopardy, guarantied him by the Fifth Amendment of the U.S. Constitution. Thus the trial and sentence that eventually ensued violated specific constitutional guaranties, therefore Weems is entitled to relief under 28 U.S.C.S. § 2255.

B. Though Timely - Weems Has Not Waived His Right to Challenge All of the Alleged Errors of Which He Complains

Even though Weems raised only two of his current claims on direct appeal, he is not procedurally defaulted. According to Massaro v United States, 538 U.S. 500, 123 S.Ct 1690, 155 L. Ed. 2d 714 (2003), the Supreme Court stated that the procedural default rule delineated by Bousley v United States, 523 U.S. 614, 622 (1998) - the example that the United States attorney used to support denial of Weems' motion - does not apply to claims of ineffective assistance of counsel. See Massaro 123 S.Ct at 1696. Thus, since these are the only claims raised by Weems in the instant motion, the procedural default rule does not apply, and thus his motion should receive the proper review by the district court.

C. Weems Can Sustain A. Claim Of Ineffective Assistance Of Counsel

The Supreme Court has established a two-part test to evaluate ineffective assistance claims. Strickland v Washington, 466 U.S. 668, 667 (1984); Lema v United States, 987 F. 2d 48, 52 (1st Cir. 1993). A party advancing such a claim has the heavy burden of proving: 1) that his attorney's performance fell below an objective standard of reasonable effectiveness, and 2) that counsel's deficient performance prejudiced the defense thus preventing a fair trial.

This being stated, Weems can establish, by a preponderance of procedural law and case law, that his counsel's performance was not within the wide range of reasonable professional assistance. For starters, effective assistance of counsel requires Weems' defense counsel to be able to advise him adequately of the available options. In order to do this, defense counsel must be familiar with the facts of the case and the applicable law. (Rogers , Maggio, 714 F. 2d 35, 37 (5th Cir. 1983); Scott v Wainwright 698 F. 2d. 427, 429 (11th Cir. 1983). In the instant matter, Weems' counsel did not know all of the applicable law concerning hung juries. This is evident by the fact that he consented to a mistrial - the worst thing that he could have done in this situation - without holding the district court judge to the three prong discretionary procedural rule handed down in this circuit in the case of U.S. v Simonetti, 998 F. 2d 39 (1st Cir. Me. 1993) (see 998 F. 2d 39 at 41), which was based on the Supreme Court case of United States v Jorn, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L. Ed 2d. 543 (1971). Weems' counsel declared a "manifest necessity" against his client's consent and his client's vociferous objections (refer to EXB. B Affidavit attached to original 2255 form). This was even after informing Weems that he would never receive testimony or evidence as favorable as was presented at the first trial. Thus, by consenting and actually declaring a "manifest

necessity," Weems' attorney put Weems under the unfair prejudice of giving the government a second bite at the apple. He could've asked for an "Allen" charge, or requested that the judge adequately answer the jury's question, or he could have had the jury polled to determine how serious the deadlock was, before just declaring a "manifest necessity."

Considering that according to the law, constitutional and precedential, that the worst thing that Weem's attorney could have done is declare a "manifest necessity," the United States Attorney or Weems' trial counsel can not say that his actions were strategic. There is no way conceivable or imaginable that where a defense attorney's actions would, in the immediate future, subject his client to evidence and testimony that would be less favorable to his client, can be considered strategic. This is further supported by the fact, that Weems' attorney told him that he was admonished by the judge, and due to the pressure from the judge, he consented to a hung jury. (Refer to EXB. B Affidavit). Weem's attorney also told his client that he was scared to argue Weems' issues against the Court because if he challenged the district court judge on a legal issue that it may hurt him financially when he comes before the district court judge in a civil action. Weems' attorney further told his client that the district court judge may hold a grudge against him and make adverse ruling towards him in a civil case if he fought hard for Weems. This in fact meant, that his loyalty was divided between his own personal concerns and the interests of his client. Thus, if Weems instructed his trial counsel to do something that was definitely in his best interest, due to counsel's personal problems and fears, he would fail to do so, thus prejudicing the defense against the charges brought against Weems.

Weems' trial counsel's actions and the basis of them, is totally out of line with the Strickland rule of counsel's duty of loyalty and "his overarching duty to advocate the defendant's cause. "Even if Weems' counsel was scared of the district court judge, he should not have allowed this fear to cause his representation of Weems' to be below the constitutional standard set forth in Strickland and related cases. Furthermore, it can be said that due to Weem's counsel's fear of the district court judge, "counsel made errors so serious that he was not functioning as 'counsel' guaranteed [Weems] by the Sixth Amendment." Strickland, 466 US, at 687, 80 L Ed 2d 674, 104 S. Ct 2052. Weems' counsel's lapses, based upon his so called not upsetting the district court judge, rendered the trial unfair so as to "undermine confidence in the outcome" of the trial. Id, at 649, 80 L. Ed 2d 674, 104 S. Ct 2052. Weems' confidence in his lawyer's attempts to bring about a fair outcome of the trial was definitely undermined due to the fact that he knew that his lawyer's fear of the district court judge was hindering his lawyer from presenting a strong defense in the adversarial process of a trial, compatible with the very nature of a trial as a search for the truth. Strickland v Washington had recognized a "limited" presumption of prejudice when counsel is burdened by an actual conflict of interest that adversely affects his performance, see id, at 692, 80 L. Ed 2d 674, 104 S. Ct 2052, quoting Cuyler v Sullivan, 446 U.S. 335, 348, 350, 64 L. Ed 2d 333, 100 S. Ct 1708 (1980). Here, Weem's has shown that his counsel's fears of the district court judge conflicted with his client's wishes, and his fear of the district court judge had adversely affected Weems' by undermining the fundamental trust between lawyer and client necessary for effective representation. This conflict of interest being the cause of Weems' counsel's errors, has prejudiced Weems, and further on in this memorandum of law it will be affirmatively proven, that there is a "reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id, 466 U.S. at 691. This is what transpired in the instant matter.

(1) Trial counsel's failure to argue issues of insufficient evidence of possession at the rule 29 hearing at first trial was unreasonable and prejudicial.

In considering a motion for a Judgement of Acquittal, this court views the evidence in the light "most helpful to the government." United States v. Oritiz, 966 F 2d. 707, 710 (1st Cir. 1992), Cert. denied 506 U.S. 1063 (1993). This court has spelled out the standard that is applicable, stating;

If the evidence "viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction.

SEE, UNITED STATES V. MORILLO, 158 F3d. 18, 22 (1st Cir. 1998).

Applying this standard to the facts of this case, the petitioner submits that this is not even a situation in which there is "equal or nearly equal support to a theory of guilt and theory of innocence. "In this case, the government's own witnesses support the theory that the defendant did not possess the weapon, from the moment the defendant is pulled from the ceiling he is in the continual control of law enforcement. The lead agent in this case testified that there were no facts at this trial that indicated gun wasn't on boxspring before Weems fell from ceiling. Still the Government argued actual possession.

> What makes sense is that he was trying to desperately get away because he knew if he got caught he would get caught with that gun..... the gun was on that boxspring. It fell there from the defendant when he was struggling with the officers, It is his gun, In was in his possession.

Tr. of July 19, 2001, at 88-89.

The charge of actual possession requires proof the defendant had direct and immediate control over the firearm by it being on his person or within his immediate reach. Tr. of July 18, 2001. At 93; the court charge to Jury. Mere proximity to a weapon is not sufficient to prove actual possession. United States v Lamare, 711 F 2d. 3, 6 (1rst Cir. 1983). Actual possession is "hands on, physical possession." United States v. Zavala Maldonado, 23 F 3d. 4, 6 (Cir. 1994), Cert. denied, 513 U.S. 975 (1994). The evidence simply did not show any such possession. In United States v. Blue, the Government only introduced evidence that weapon was found under seat where defendant sat, 4th Cir. said;

> The Government produced no evidence that Blue actually possessed the firearm, instead, it prosecuted the case on the theory of constructive possession.

United States V. Blue 957 F 2d. at 107.

In this trial the government did not even argue constructive possession (See rule 29 Hearing) as a theory of guilt, though there was an instruction to the Jury on this theory. At most, the evidence shows that Weems was in the same room in which the gun was said to have been found. Constructive possession may not be based on mere proximity to a gun. This court has defined constructive posession as having dominion and control over an object. Constructive Possession:

> '... should not be lightly imputed to one found, in another's apartment or home. United States v. Holland, 144 App. D.C. 225, 445 F. 2d 701, 703 (D.C. Cir. 1971)

United States v. Mooney, 788 F. Supp, 592, 595 (D.D.C. 1992). In both United States v. Mooney and in United States v. Holland, 144 App. D.C. 255, 445 F 2d. 701, 702, 703 (D.C. Cir. 1971), the fact that a man was in an apartment bedroom where contraband was found, was not sufficient to establish constructive possession. Mere proximity to a gun is not enough to show constructive possession. See United States v. Beverly, 750 F. 2d 34 (6th Cir. 1984), defendant standing next to waste basket in which gun was found with a print of the defendant on the gun; United States v. Blue, 957 F 2d. 106, 108 (4th Cir. 1992), rejecting the governments contention that the defendant constructively possessed a pistol underneath his seat when the only evidence of a nexus was an officers testimony that the defendant dipped his shoulder as the officer approached; United States v. Hishaw, 235 F. 3d 365 (10 Cir. 2000). Evidence was insufficient to prove that defendant constructively possessed semiautomatic pistol found under the passengers seat in the car he was driving.

The continuing thread that weaves through all of these cases is that the Government must present evidence to show some connection or nexus between the defendant and the firearm other than defendants presence and proximity. In United States v. Luciano - Mosquera, 63, F. 3d, 1142 (1st Cir. 1995) This court found the evidence insufficient to sustain defendants conviction for carrying, or aiding and abetting the carrying of, submachine gun during any relation to drug trafficking offense;

> Although defendant was found under Jeep in which submachine gun had been hidden, he was on opposite side of Jeep from where gun was stuck up between chasis and springs, it was not reasonable to infer that he saw weapon when he was under Jeep; there was no evidence linking defendant to Puerto Rico end of cocaine smuggling operation where he would have been in a position to know about submachine gun. The Government's only evidence connecting Pava-Buella to the M-16 was the fact he was found under the Jeep in which the M-16 had be found. Id. at 1151. (emphasis added)

The laws and facts of this case was available to petitioners counsel prior to rule 29 hearing. ( See affidavit exhibit E ). The Supreme Court has established a two part test to evaluate Ineffective Assistance claims. Strickland v. Washington, 466 U.S. 668, 667 (1984), Lema v. United States, 987 F. 2d. 48, 52 (1st Cir. 1993). A party advancing such a claim has the heavy burden of proving: 1) that his Attorney's performance fell below an objective standard of reasonable effectiveness, and 2) that counsels deficient performance prejudiced the defense thus preventing a fair trial. Strickland, 466 U.S. at 788-89; Lema, 987 F.2d. at 51.

If petitioners counsel would have argued the facts of this trial was legally insufficient to go to the Jury, and showed Governments argument that; "there was no gun in room until defendant fell from ceiling" at rule 29 hearing as being clearly erroneous, the court having taken an oath to be neutral and rule objectively to the law would have acquitted petitioner. Rule 29 (A) Motion for Jedgement of Acquittal states; after the close of all the evidence, the court on the defendants motion must enter a judgement of acquittal of any offense for which the evidence is insufficient to sustain a conviction.... Counsels performance was deficient and such performance did prejudice petitioner. The two - part test of ineffective assistance of counsel has been satisfied by the facts stated in Petitioners claims:

> A convicted defendant alleging ineffective assistance of counsel must show not only that counsel was not functioning as the counsel guaranteed by the Sixth Amendment so as to provide reasonably effective assistance but also that counsels errors were so serious as to deprive the defendant of a fair trial because of a reasonable probability that, but for counsels unprofessional errors, the results would have been different.

Strickland v. Washington, 80 Led 2d 674 (1984).

Counsels performance fell below an objective standard of reasonable effectiveness. There is also a reasonable probability that, but for counsels unprofessional errors, the results would have been different. Since petitioners claims of communications and request to attorney took place off the record (See exhibit E___). Petitioner request evidentiary hearing on this matter.

(2) Weems Can Show That His Counsel's Consent to a Mistrial Over His Objection Prejudiced The Defense

Weems' counsel was ineffective because he consented to a mistrial at the first trial without Weem's consent, thus resulting in no bar to his retrial and subsequent conviction. Weems' counsel waiver of his client's valued right to have his trial completed by a particular tribunal was not a voluntary wavier by Weems, and therefore prejudiced him by subjecting him to double jeopardy, in violation of the Fifth Amendment of the U.S. Constitution. This declared "manifest necessity" by Weems' counsel was inherently prejudicial to Weems' defense, due to the fact that it gave the prosecution a chance to strengthen evidence against Weems and receive a second bite at the apple.

As a general rule, defense counsel in a criminal case cannot validly waive constitutionally protected rights of a defendant in absence of intelligent and voluntary consent by defendant and this rule comes into play where a defendant-as Weems did (See EXB. B Affidavit) in this case - expressly conveys to his attorney an objection to proposed actions. (See Walker v Lockhart, 620 F. 2d 683 at 686, 687 (1980).

Here, Weems contends and has submitted a sworn affidavit that he was not present in chambers when his counsel consented to a mistrial and when it was formally granted by the district court judge. The United States Attorney discredits Weems on this point, by stating that "[a]ssuming the veracity of Weems' allegation, ie., that his counsel consented to mistrial over Weems'

objections, Weems was not prejudiced as a result." See pg. 17 of Memorandum of Law In Support of United States Objections... The only way that the United States attorney can be true and lawful is if the district court judge was aware of Weems' position, and after careful consideration and scrupulous discretion, overrode Weems' objection, and declared a "manifest necessity." In this case though, the district court judge was not made aware of Weems' objection via his counsel, and since it seemed that Weems was consenting to the mistrial via his counsel, the district court judge declared a "manifest necessity," then proceeded to discharge the jury. Nevertheless, according to the holding of the Supreme Court in Brookhart v Janis, 384 U.S. 1, 86 S.Ct 1245, 16 L.Ed 2d 314 (1966), there is a serious due process violation, stemming from Weems' trial counsel's actions. The Janis case strongly supports the fact, that absent exceptional circumstances, Weems' trial counsel cannot validly waive Weems' constitutionally protected right against being subjected to double jeopardy, without an intelligent and voluntary consent by Weems' stating that he wanted his trial counsel to declare a mistrial.

Furthermore, Weems' counsel's action prejudiced Weems due to the fact that the right to be free from double jeopardy is a federally protected right, and in the absence of exceptional circumstances as suggested in Janis (348 U.S. at 7, 86 S.Ct. at 1248, citing Henry v. Mississippi, 379 U.S. 433, 451, 855 S.Ct 564, 569, 13 L. Ed 2d 408 (1965)), supra, it would seem clear that the right to be free from such jeopardy includes the right to be free from double jeopardy resulting from a second trial following an improperly granted original mistrial over the objection of Weems.

If during the chambers conference (See Appendix Volume II, 7/19/01 (Day III) (Chambers), the district court judge would have been advised of Weems' attitude it would have been easy for the judge to have called Weems and his counsel back into chambers and have explored the matter further. As of that time the jury had not been advised of a mistrial and discharged.

As to whether the district court judge was advised of Weems' position prior to discharging the jury, the findings of the record are indefinite to say the least. Therefore, an evidentiary hearing should be conducted to determine if Weems' trial counsel informed the court of Weems' objection to the declaration of a mistrial, a "manifest necessity."

Also the United States attorney states that "the Court could have declared a mistrial without either Weems or his counsel..." and that "[s]ince Weems' consent to a mistrial was not necessary in these circumstances, trial counsel's alleged consent to mistrial over his objection did not prejudice him and he cannot make out a claim of ineffective assistance of counsel...." The United States attorney is totally wrong according to Janis, on the issue of ineffective assistance of counsel. She is also wrong on the issue of the court being able to declare a mistrial, in this case without Weems or his counsel.

A clear distinction lies between mistrials granted at the request of the defendant, or with his consent, and those declared by the court sua sponte, with respect to whether the double jeopardy clause bars reprosecution. United States v. Dinitz, 424 U.S. 600, 606-08, 96 S.Ct 1075, 1078-80 (1976). In the absence of a motion or consent by the defendant, the Supreme Court has dictated that there can be no new trial unless there was a "manifest necessity" for the mistrial or "the ends of public justice would otherwise be defeated." United States v. Jorn, 400 U.S. 470, 481, 91 S.Ct. 545, 555, 27 L. Ed. 2d 543 (1971), quoting United States v. Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L. Ed 165 (1824). This doctrine of "manifest necessity" recognizes the significant interest of the defendant in deciding whether, "once and for all, to conclude his confrontation with society through the verdict of tribunal he might believe to be favorably disposed to his fate." United States v. Jorn, 400 U.S. at 486, 91 S.Ct at 557. The analytic framework is simple enough. Jeopardy attaches

when the original panel is seated and sworn. Crist v. Bretz, 437 U.S. 28, 38, 98 S.Ct 2156, 2162, 57 L. Ed 2d. 24 (1978). Once jeopardy attaches, prosecution of a defendant before a jury other than the original jury, excluding any contemporaneously empaneled and sworn alternates, is barred unless (1) there is a "manifest necessity" for a mistrial or (2) the defendant either requests or consents to a mistrial. See Dinitz, supra; also see Watkins v. Kassulke, 90 F. 3d. 138 at 141, (C.A.6(Ky.) 1996. In the instant case there was no "manifest necessity" for a mistrial, and Weems did not consent or request a mistrial. Weems' counsel was ineffective by spontaneously waiving his right to double jeopardy, by declaring a mistrial against Weems' objections. This fact is further supported by the fact that Weems' lawyer told him that he would never have a trial setting again with such favorable evidence. Therefore, his blatant disregard of Weems' double jeopardy right can in no way be considered strategic. Nowhere, in America, can you find any criminal defense lawyer who would strategically place his client "in harms way" by having him tried where the evidence would be less favorable to his client, if said lawyer could prevent it . Thus, the United States attorney's assertion that Weems' lawyer strategically declared a mistrial over Weems' objections falls with this premise.

As to whether the district court judge could have declared a manifest necessity... "The determination whether 'manifest necessity' exist for the declaration of a mistrial is, of course, an inquiry particularly suited to case-by-case analysis, and not hospitable to generalities." United States v Spinella, 506 F. 2d 436, 432 (5th Cir), cert. denied, 423 U.S. 917, 96 S.Ct 227, 46 L. Ed. 2d 147(1975). United States v Evers, 569 F. 2d. 876, 878 (5th Cir. 1978).

It can not be gainsaid that Weems' attorney's declaration of a mistrial over Weems' Vociferous objections was not only inappropriate but also prejudicial. Nonetheless, if it was true that (1) Weems' attorney consented to a mistrial. (2) the trial court declared the mistrial in chambers, (3) Weems was not present in chambers when mistrial was declared, (4) the jury was unaware of the trial court's ruling, and (5) Weems vehemently and vociferously instructed his lawyer not to request a mistrial, before the trial court informed the jury of the declaration of a mistrial, then the trial court was duty bound to consult with Weems, recognize and grant his request unless there was a manifest necessity or the ends of public justice required otherwise. Of course, this last part did not occur, due to the fact that Weems' attorney did not inform the trial court of Weems' wishes-according to the record - which is one more reason why he is considered ineffective; he did not protect and/or present the position of his client. E.g. United States v Rich, 589 F. 2d. 795 (1975); Brady v Samaha, 667 F. 2d 224 (1st Cir. (N.H.) 1981); Love v Morton, 112 F. 3d. 131 (3rd Cir. 1997); United States v Evers, supra, 569 F. 2d at 879 (reprosecution barred where there was no "manifest necessity" For mistrial within the rule that a declaration of mistrial over objection of defendant requires justification of manifest necessity); United States v Martin, 561 F. 2d 135 (8th Cir 1997).

The United States attorney cannot find Henry v Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L. Ed. 2d 408 (1965), apposite. Henry cited with approval in Brookhart v Janis, 384 U.S. 1, 7, 86 S.Ct. 1245, 1248, 16 L. Ed. 2d 314 (1996), involved a deliberate by-pass of counsel with the contemporaneous objection rule as part of trial strategy. The present case has nothing to do with trial strategy, but involves whether or not Weems can waive or give up a supposed advantage, i.e., the declaration of a mistrial. Also distinquishable

are those cases which typically deal with the illness of the trial judge, e.g. United v Lynch, 598 F. 2d 132, 135 (D.C. Cir 1998) (cases cited therein, cert. denied, 440 U.S. 939, 99 S.Ct. 1287, 59 L. Ed. 2d 498 (1979), or the disability of a juror, e.g., United States v Potash, 118 F. 2d. 54 (2nd Cir 1941) or bias of a juror, e.g. Thompson v United States, 155 U.S. 271, 15 S.Ct. 73, 39 L. Ed. 146 (1894), or a distraught witness, e.g. United States v Walker, 557 F. 2d 741 (10th Cir 1977), or involved a defective indictment, Illinois v Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L. Ed. 2d 425 (1973). Such cases are representative of "those instances where 'a defendant's valued right to have his trial completed by a particular tribunal must ... be subordinated to the public's interest in fair trials designed to end in just judgements'" United States v Bobo, supra 586 F. 2d at 365, citing Wade v Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L. Ed. 974 (1949). Similarly, the double jeopardy clause does not bar reprosecution "after a conviction is reversed on appeal, or on collateral attack. Likewise, a second prosection is not prohibited when the jury is dismissed because they cannot reach a verdict, because of a tactical necessity in wartime." United States v Starling, 571 F. 2d. 934, 938 (5th Cir 1978).

In the instant case, the trial court did not exercise its "sound discretion" in declaring a mistrial, especially in light of the "high degree" of manfest necessity required before the declaration of a mistrial is appropriate. Arizona v Washington, 434 U.S. 497, 98 S.Ct. 824, 54 L. Ed. 2d 717 (1978); also see US v Simonetti, 98 F. 2d. 39 at 41, no. 1, (1st Cir (Me) 1993), for a three prong application of the Jorn, supra, 'scrupulous exercise of judicial discretion standard' (cases cited therein). Also, under the circumstances in the instant case, if deemed true, the trial court can or should not become so paternalistic, as to deny Weems his "valued right to have his trial completed by

(that) particular tribunal, Wade v Hunter, supra, 336 U.S. at 689, 69 S.Ct at 837. In the original 2255 Form Weems argued that he informed his attorney, before the district court judge notified the jury of the declaration of a mistrial, that he wanted to proceed with the trial. In effect, Weems stated that "he wished to have his fate decided by the jury first impanelled and to avoid "the anxiety and heartbreak of (and delay in awaiting) another trial,' the very concern with which the double jeopardy clause deals." United States v Evers, supra, 569 F. 2d at 880, citing Abney v United States, 431 U.S. 651, 97 S.Ct 2034, 52 L. Ed. 2d 65 (1977). The reviewing judge, should be reluctant, on this record, to conclude that Weems "waived his constitutional right not to be placed in jeipardy for the same offense unless he did so knowingly and intelligently." United States v Rich, 589 F. 2d. 1025, 1032-33 (10th Cir 1978), citing Cox v Kansas, 456 F. 2d. 1279 (10th Cir 1972). Contra, United States v Dinitz, supra, 424 U.S. at 609 n. 11, 98 S.Ct. at 1080; United States v Bobo, supra, 586, F. 2d. at 364-65; United States v Jamison, 164 U.S. App. D.C. 300, 306, 505 F. 2d. 497, 413 (1974).

Assuming Weems' statement of facts is accurate, then the trial court's declaration of a mistrial was not justified by manifest necessity or required to serve the ends of public justice and accordingly, it would hold that Weems' second trial was barred by the double jeopardy clause. However, inasmuch as the record in the instant case is unclear about happened and when, compare Arizona v Washington, supra, 434 U.S. 497, 98 S.Ct. 824, 54 L. Ed. 2d. 717, a hearing to determine whether Weems' request to vacate the trial court's order granting a mistrial was made knowingly and intelligently is appropriate. In particular, further evidentiary hearings should be conducted, to determine whether, before the trial court declared a mistrial in open court, the trial court knew that Weems wanted to proceed with the trial and opposed his counsel's consent for a mistrial.

Finally, the United States attorney is wrong concerning the premise that, "the Court could have declared a mistrial without the consent of either Weems or his counsel," Especially considering First Circuit precedent cases addressing the subject of mistrials. In a case similar to the instant case, United States v Hotz, 620 F. 2d 5 (1st Cir (Mass.) 1980), where the jury deliberated for 4 hours, 15 minutes, it was held that "[t]hat the fact that the jury seemed dead-locked over a single issue after four hours did not mean that another shot at reaching agreement was manifestly doomed to failure." Id at 6. The same principal applies in the instant case. The Hotz court also stated, "[i]f a jury fails to reach agreement after deliberating long enough to warrant a conclusion that agreement is not fairly possible, the court may declare a mistrial and avoid double jeopardy, but this is to be done with great reluctance. While a district court has broad discretion in determining if a mistrial is required by the jurors' reaching an impasse, Arizona, ante, 434 U.S. at 509, 98 S.Ct. at 832, we know of no case in which such a determination has been made after so short a time." Id at 6, n. 2, 3 (emphasis added). The same principle applies in the instant case, where a mistrial was declared after the jury deliberated for only 4 hours, and no other alternatives were considered. Therefore, the district court erred in declaring a mistrial, at Weems' counsel's provocation.

This premise is further supported by the case of Brady v Samaha, 667 F. 2d 224 (1st Cir (N.H.) 1981). The Samaha court determined that since the case of United States v Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L. Ed 165 (1824) the Supreme Court has interpreted "manifest necessity" to mean a "high degree of necessity, and its existence vel non will depend on the type of problem at trial that prompts the judge to consider a mistrial. See also Arizona v Washington, 434 U.S. at 506, 98 S.Ct. at 831.

Samaha, also stated that "[e]ven assuming that the trial judge is in the best position to assess the prejudicial impact of trial events on the jury and, therefore, deserving our deference, he "must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." 667 F. 2d at 228, quoting United States v Jorn, 400 U.S. 470, 486, 91 S.Ct. 547, 557, 27 L. Ed. 2d. 543 (1971). In the instant case, the trial judge did not even attempt to temper his decision before aborting trial, thus legally he could not have just declared a mistrial, as the United States attorney says that he can. This fact is further supported by the fact "since the Perez decision, the Supreme Court has refused to apply the manifest necessity standard in a rigid or mechanical fashion... The one constant is that the actions of the trial judge in arriving at the decision to declare a mistrial have been scrutinized in an effort to ensure that a "scrupulous exercise of judicial discretion" led to the decision. Whether or not the record indicates he has considered alternatives to a mistrial is significant. 667 F. 2d at 229, quoting Jorn, 400 U.S. at 485, 91 S.Ct at 557. In the instant case, no part of the record indicates that the trial judge had considered any other alternatives. Thus, again, contrary to what the United States attorney thinks, the trial judge could not have legally declared a mistrial, after only 4 hours of jury deliberation. Samaha, goes on to say, "[e]mbracing both these factors - consideration of alternatives and consultation with counsel - is the amount of time devoted by the judge to the mistrial. A precipitate, reflected by a rapid sequence of events culminating in a declaration of mistrial [as what transpired in the instant case], would tend to indicate insufficient concern for the defendant's constitutional protection." 667 F. 2d at 229. Evidently, the trial

judge or Weems' counsel cared nothing about Weems' constitutional right. And even though "a reviewing court may defer to the trial court's discretion to make a mistrial decision, (i)f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for such deference by an appellate court disappears." Id, at 229, quoting Arizona v Washington, 434 U.S. at 510 n. 28, 98 S.Ct. at 832 n. 28. The actions of the trial court in the instant case indicate the total opposite of the deliberation and concern, mandated by the Supreme Court since 1824, towards Weems' constitutionally protected interest in completing his trial.

In summary, the aforementioned allegations are further supported by the case of United States v Simonetti, (1st (Me) 1993). The Simonetti court stated that "[w]here mistrial is declared over defendant's objection, retrial is permissible only if the mistrial was justified by "manifest necessity." Id at 42 (case cited therein). Simonetti also states that "[t]he prosecution bears a heavy burden in demonstrating that "manifest necessity" exists when the defendant's "valued right to have his trial completed by a particular tribunal" is implicated." Id at 42 (cases cited therein). Moreover, the Simonetti court laid down a three prong test to determine whether "the trial judge (1) considered alternatives to a mistrial, (2) afforded counsel an opportunity to be heard on the issue, and (3) decided precipitously or after sufficient reflection. Id at 41 (cases cited therein) (emphasis added).

In the instant case, the district court judge did not scrupulously exercise his discretion. After the deadlock was discovered, the trial judge held a conference in chambers and only suggested a mistrial, never considering any other options, i.e. dismissal, an Allen charge, a detailed answer to the jury's question. In his mind though, it was already a foregone conclusion to declare a mistrial. "My inclination is this a simple case. If they've deliberated

this long and haven't reached a verdict, I don't really think it will do much good to ask good to ask them to continue." Appendix II, 7/19/01, 8-12. Being that an inclination is the tendency to act or think in a certain way, or an attitude, the district court judge's own words clearly reflect that he never considered any other alternatives other than declaring a mistrial. Thus, again, contrary to what the United States attorney posits, the trial judge should not have declared a mistrial, and could not, if he had followed the law, even though Weems' counsel gave him a way out, and allowed him to do so, over Weems' vociferous objections to his counsel.

(3) Weems Can Demonstrate That His Counsel Slept During His Trial or Assuming the Veracity of His Claim, Prejudice Did Result

According to Javor v U.S., 724 F. 2d. 831, (9th Cir (1984), "when an attorney for a criminal defendant sleeps through a substantial portion of the trial, such conduct is inherently prejudicial and thus no separate showing of prejudice is necessary." See Javor, supra, 724 F.2d at 833. Also, in the case of Burdine v Johnson, 262 F. 3d 336 (5th Cir. (2001), it was held that, "[i]t is well established that a defendant "requires the guiding hand of counsel at every step in the proceeding against him... quoting, Powell v Alabama, 287 U.S. 45, 69, 53 S.Ct 55, 64, 77 L. Ed. 158 (1932).... "Moreover, both the Supreme Court and this Court have recognized that the absence of counsel at critical stages of a defendant's trial undermines the fairness of the proceeding and therefore requires a presumption that the defendant was prejudiced by such deficiency. See United States v Cronic, 466 U.S. 648, 659, 104 S.Ct 2039, 80 L. Ed 2d 657 (1984); United States v Russell, 205 F. 3d. 768, 770-71 (5th Cir. (2000). Applying this longstanding principle, we conclude that a defendant's Sixth Amendment right to counsel is violated when that defendant's counsel is repeatedly unconscious through not insubstantial portions of the defendant's

capital murder trial. Under such circumstances Cronic, requires that we presume that the Sixth Amendment violation prejudiced the defendant."

In the instant case, it seems that Weems' counsel was suffering from syncope. Syncope is defined as "[a] brief loss of consciousness caused by temporary deficiency of oxygen in the brain; a swoon. Cf AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, FOURTH EDITION. Since everyone involved with this case are all laymen concerning the medical field, an evidentiary hearing should be conducted to determine what pre-syncope symptoms are.

Nevertheless, even though Weems did not submit an affidavit supporting his contention, he has filed a motion requesting to expand the record pursuant to Title 28 U.S.C. Section 2255, rule 7 (b). Should this request be granted, then the United States attorney and the district court will learn that the only reason why Weems' counsel objected during Macon's brief testimony was because Weems had to wake him up to do so. Also, the only reason why Weems' counsel was able to cross-examine Macon on 10/18/01, was because he had been given a copy of the transcripts of Macon's trial testimony by the trial judge, during a conference. Furthermore, because of Weems' counsel's unconsciousness, i.e. nodding off, he did not object to the United States attorney showing Macon the gun. This questioning was prejudicial to the defense since the United States attorney did not lay down the foundation for her questioning by having Macon first describe the gun before showing it to him. Weems and his counsel had agreed that counsel would object to the aforementioned scenario, prior to the trial commencing that day. Also, the fact that Weems' counsel told the trial judge - during a conference - that the reason why he needed transcripts of Macon's testimony was because after he collapsed he could not recall any of Macon's testimony, further supports the fact that he was unconscious during substantial portions of the trial. If he was awake the whole time during Macon's testimony, and was aware of everything that was transpiring, he would

have had no need of any transcripts. This is true, especially considering that there was nothing extremely complex or illustrious about Macon's testimony, warranting the trial judge breaking protocol and procuring transcripts during trial for Weems' counsel. fn 1 pg. 35

In general, Weems, claiming ineffective assistance of counsel must demonstrate that (1) his counsel's conduct "Fell below an objective standard of reasonableness," and (2) this incompetence caused prejudice to the defendant. Strickland v Washington, 466 U.S. 688 - 88, 104 S.Ct at 2064, 80 L. Ed. 2d 674 (1984). An attorney is presumed to be competent, and "the burden rest on the accused to demonstrate a constitutional violation." United States v Cronic, 466 U.S. 648, 658, 104 S.Ct 2039, 2046, 80 L. Ed. 2d 657 (1984).

Strickland recognized however, that there are some situations where prejudice will be presumed, because it will be "so likely that case-by-case inquiry into prejudice is not worth the cost," 466 U.S. at 692, 104 S.Ct at 2067, because such errors are "easy to identify," and because such deprivations are "easy for the government to prevent." Id. Examples are cases of "[a]ctual or constructive denial" of counsel or state interference with counsel's assistance.

Strickland also discussed another more limited, type of presumed prejudice, and it offered as one example cases in which counsel is burdened by a conflict of interest. Id. In such instances, counsel has breached his duty of loyalty, and "it is difficult to measure the precise effect on the defense" of such a conflict. Id. Moreover, trial courts can "make early inquiry in certain situations likely to give rise to such conflicts," id., and remedy them. In such instances, the Supreme Court required a showing that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected" counsel's performance. Id. (Citation and quotation marks omitted).

It is understandable that this court may be reluctant to extend a rule of per se prejudice in any new direction. Ordinarily, episodes of inattention or slumber are perfectly amenable to analysis under the Strickland prejudice test. And, as the United States attorney argues, there are real dangers in presuming prejudice from a lack of alertness. Prolonged inattention during stretches of a long trial (by sleep, preoccupation or otherwise), particularly during periods concerned with other defendant's, uncontested issues, or matters peripheral to a particular defendant, may be quantitatively substantial but without consequence. At such times, even alert and resourceful counsel cannot affect the proceedings to a client's advantage.

However, as the majority reasoned in Javor, "[p]rejudice is inherent" at some point, "because unconscious or sleeping counsel is equivalent to no counsel at all." 724 F. 2d at 834. Effectiveness of counsel depends in part on the ability to confer with the client during trial on a continuous basis, and the attorney must be "present and attentive" in order to make adequate cross-examination-- "a mater of constitutional importance" by virtue of the Sixth Amendment. Id. Moreover, if counsel sleeps the ordinary analytical tools for identifying prejudice are unavailable. The errors and lost opportunities - as in this case - may not be visible in the record, and the reviewing court applying the traditional Strickland analysis may be forced to engage in "unguided speculation." Id. (quoting Cooper v Fitzharris, 586 F. 2d 1325, 1332 (9th Cir 1978) (in banc) (citation omitted) cert denied, 440 U.S. 974, 99 S.Ct. 1542, 59 L. Ed. 2d. 793 (1979).

Although, the United States attorney argues that Weems failed to carry his burden of adducing specific attorney errors resulting in prejudice, it must be understood that Weems' claim of prejudice to be not that his lawyer should have taken any particular initiative that would potentially affect the result, but that,

at critical times, Weems had no counsel to sort out what initiatives were open. Under these circumstances, where the adversary nature of the proceeding was subject to repeated suspensions of Weems' counsel's attention, there is little difference between saying that prejudice will be presumed and saying that prejudice has been demonstrated.

It therefore should be concluded that Weems suffered prejudice, by presumption or otherwise, since his trial counsel was repeatedly unconscious at trial for periods of time in which Weems' interest were at stake. Such circumstances implicate a fundamental value that Strickland enjoins the United States attorney to keep in mind:

"A number of practical considerations are important for the application of the standards we have outlined. Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of the decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." Strickland, 466 U.S. at 696, 104 S.Ct at 2069.

Finally, due to the fact that the record does not clearly show Weems trial counsel's actions, prior to him collapsing, and the trial judge can not adequately recall, without speculating, whether he slept, or since it is a possibility that the trial judge may have not noticed Weems' counsel's periods of unconsciousness, then an evidentiary hearing should be held, concerning Weems' claims. Since this case is not one in which "the judge's recollections

of the events at issue... enable him to summarily dismiss a §2255 motion..." Blackledge v Allison, 431 U.S. 63, 74 n.4, 97 S.Ct. 1621, 52 L. Ed. 2d 136 (1977), and because the record does not "conclusively show that [Weems] is entitled to no relief," the district should conduct an evidentiary hearing, furthering more knowledge as to Weems' claim, that his counsel slept through a substantial part of his trial. See U.S. v Moore, 87 Fed. Appx 668, (9th Cir (2004); (See Attachment D).

fn 1 Petitioner states in claim four (D) of 2255 motion that the court should have held competency hearing after Attorney Richardson fainted during trial. Especially after Attorney Richardson told court he couldn't remember Macon's testimony after he fainted and needed copy of Macon's trial testimony during trial. United States on pg. 24 of their memorandum of law states: "Weems did not raise this issue on appeal. Thus, unless he can demonstrate cause and prejudice for not raising this claim on direct appeal his claim must be rejected." Weems, informed Appellant Attorney Robert Mann to include this argument on direct appeal and Mr. Mann failed to do so. Weems now brings this claim under section 2255 for ineffective assistance of counsel on appeal. (See Evitts v Lucey, 469 US 387, 83 Led 2d. 821, 105 S.Ct. 830 (1995). Also used to support Weems claim that court erred by not holding competency hearing after Attorney Richardson fainted is Johnson v Norton, 151 f. supp. 2d. 130. The Johnson case is based on a reversal due to the fact court did not conduct a competency hearing after defendant (Johnson) fainted during trial. Petitioner was unable to find any case law on all fours (which states what direction court should take after attorney faints in court) but the principles of law in Johnson should apply to attorneys even more so because their job is even more strenuous than defendants. Additionally, court should have questioned jury after attorney fainted to determine if jury could remain impartial after seeing attorney collapse. (Jury could have seen attorney as being inadequate). Weems appellant attorney was ineffective for not raising this claim on direct appeal, and such, ineffectiveness did prejudice Weems and deprived him of his due process of law and his right to effective assistance of counsel during his second trial.

(4) <u>Weems Can Demonstrate That he Was Prejudiced From Trial Counsel's Failure to Inform The Court About The United States Marshals Restraint of Weems During Trial</u>

Immediately following Weems' counsel fainting in the courtroom, the United States Marshals restrained Weems and directed him not to move. The United States attorney states that no prejudice resulted. She bases this premise on the fact that it is common practice to restrain defendants by the use of shackles or stun belts in the face of an "extreme need" to maintain the security in the courtroom. This may be true in certain circumstances, but in the instant case the United States attorney's reasoning is totally erroneous.

In a similiar stun belt case, <u>Chavez v. Cockrell</u>, 310 F3d 805 (5th Cir. (Tex) 2002), where the defendant was on trial for capital murder, it was held that due to the court's finding that the defendant posed a legitimate risk of flight during trial, it was found that the use of a stun belt, hidden under the clothes of the defendant, was warranted. In the instant case, the court never determined that Weems' was a flight risk, thus the physical restraint of Weems' by United States Marshal had the potential to taint Weems' in the eyes of the jury. Moreover, in <u>Chavez</u>, when the stun belt inadvertently went off during trial, the trial judge paused the trial, then individually questioned the empaneled jury concerning their ability to remain impartial. Also, in the case of <u>United States v. Pina</u>, 844 F.2d 1, 8 (1st Cir. 1988), it was held that

the juror's exposure to the defendant while in handcuffs was not prejudicial after the trial judge questioned jurors and they insisted they could remain impartial. In the instant case no questioning of the jurors was done, thus the United States attorney is being assumptive and speculative when she states that no prejudice resulted from Weems being grabbed by the United States Marshalls; she simply does not know. Furthermore, she does not present any evidence that there was a situation of "extreme need" to maintain courtroom security, especially considering that Weems was not deemed a flight risk by the court, nor did he make any attempt to move when his counsel collapsed.

Moreover, every day that trial was conducted, Weems was brought into the courtroom by the U.S. Marshalls, and unhandcuffed, while the jury was still out of the courtroom. This, presumptively so, was done so as not to prejudice the jury. As the Supreme Court developed in Holbrook v. Flynn, 475 U.S. 560, 568-69, 106 S. Ct. 1340, 89 L. Ed 525 (1986), shackling, like prison clothes, is an indication of the need to seperate a defendant from the community at large, creating an inherent danger that the jury may form the impression that the defendant is dangerous or untrustworthy. This same impression upon the jury, warned of in Holbrook, can be formed by the jury of the instant case, especially after observing the actions of the United States Marshall's towards Weems. This premise is further supported by Stewart v. Corbin, 850 F.2d 492, 497 (9th Cir. 1988), where it was held that:

> "[I]n the presence of the jury, [the defendant] is ordinarily entitled to be relieved of handcuffs, or other unusual restraints, so as not to mark him as an obviously bad man or to suggest that the fact of his guilt is a foregone conclusion"

In the instant case, Weem's counsel upon being informed by Weems that he was physically restrained by the United States Marshall in the presence of the jury, should have moved the court to individually interview each juror to determine whether or not each juror could remain impartial in assessing Weems guilt or innocence. This would have remedied the possibility of Weems being tried by a partial jury. The fact that this was not done means that there is the possibility that the jury's verdict was unduly influenced - no matter how slight that influence may be - by them seeing Weems restrained by the United States Marshalls. Also the fact that Weems' counsel did not move the court to individually question the jurors, to determine if they could remain impartial after seeing Weems restrained and escorted to holding cell area, means that he did not even attempt to make sure that Weems was not prejudiced and/or make sure that his right to a fair trial, guaranteed by the Sixth Amendment, was secure. This failure on Weems' counsel's part, to make sure that his client's Sixth Amendment right to a fair trial was intact, definitely prejudiced Weems.

An evidentiary hearing should be conducted to determine if Weems counsel's inaction of failing to move the court to question the jurors as to their impartiality toward Weems, after seeing him

restrained, prejudiced him. This hearing also will determine if the United States Marshals actions towards Weems substantially influenced their verdict. If it is found that the incident did influenced their verdict, then the verdict should be overturned.

(5) Weems Counsel Was Ineffective in His Conducting His Cross-Examination of Christopher Macon

After Weems' counsel fainted on the second day of trial, he did in fact, fail to pursue the same line of cross-examination, impeaching Macon's credibility concerning when and where he saw Weems, and cross-examine Macon on differences in the Government's notice of Macon's expected testimony and his trial testimony. All of the information concerning Macon's impeachment were available to Weems' counsel before trial, thus there is absolutely no excuse as to why he did not utilize this information to the benefit of the defense.

On day III of the second trial, Thursday October 18, 2001, Macon testified to the following:

> Q: So when you went to Det. O'Mara
>
> A: O'Mara.
>
> Q: Kerry, right, you had this hanging over your head, you knew you would get in trouble if that domestic assault charge went forward somehow, right?

A: No.

Q: You didn't think that you could get in any trouble?

A: No cause I knew was (sic) going to get dismissed. I knew my girl was going to drop the charges because it was just a argument (sic) and her mother pushed the issue of me being removed from the house. So I knew it was going to get dropped. So that was not the problem.

Q: But Det. O'Mara went to Court with you, right?

A: No.

Q: He never did?

A: No.

Q: He never went to Court with you?

A: No.

(Appendix 1, 10-18-01 (Day III)pg 8-9)

The answers that Christopher Macon gave were blatant lies, and Weems' counsel knew it, yet he did nothing to prove that Macon's testimony was false, thus he was patently ineffective. In a letter to Weems' counsel, dated August 24, 2001 (see Ex.F ) Assistant United States Attorney Stephanie S. Brown, stated: "Christopher Macon was accompanied by Providence Police Officer Kerion O'Mara to the District Court regarding a court appearance for domestic assault in 2000. Detective O'Mara notified the state prosecutor of the fact that Macon was cooperating with law enforcement. The prosecutor agreed to continue Macon's

case." At the time of trial Weems' counsel, did, in fact, have this letter in his possession. If he would've quoted it to Macon and/or questioned him about Officer O'Mara notifying the state prosecutor of his cooperation, and the prosecutor subsequently continuing Macon's case, then it would have been blatantly shown that he was lying. The fact that he didn't shows that he was in fact, ineffective.

Macon also gave false testimony again:

Q: Now, you mentioned earlier that you saw "True" and "Understanding" get out of a car and "Understanding" got arrested, correct?

A: No. I said "True" and "Understanding" got in the car. MR. RICHARDSON: Right.

A: "True" ran and "Understanding" got arrested. Yes, that's what I said.

Q: "Understanding" got arrested. How did that happen?

A: Because he got caught in the car. He didn't have time to get out.

Q: Do you remember standing there and you saw Mr. Weems get out of the car and then--

A: Yeah.

Q: And "Understanding" was driving the car, is that-

A: He pulled out of the driveway.

MR. RICHARDSON: Right

A: The police got behind him. He tried to get away and he couldn't. He pulled up in the yard. "True" jumped out of the car. "Understanding" didn't have time to get out of the

car only because the police was on him

Q: All right. And you think "Understanding" was driving the car.

A: I know he was. I was watching him.

(Appendix 1, 10-18-01 (Day III) pg.15-16)

According to the police report (see Exhibit G___), what Macon described in his testimony, concerning a car, the defendant ("True") and another male ("Understanding"), never transpired. What actually transpired was that 8:58 P.M. the "police observed a black male subject and famale walk out from the rear of 90 Pleasant and onto PadelFord where they go[t] into" a red Lexus parked on the driveway at 10 PadelFord St. Refer to Exhibit G____. Police then subsequently stopped the vehicle in front of 94 Pleasant St. where the driver was identified as a female Eunique Wilson. "The passenger was positively identified by Ptlm. Pereira as the subject that was observed exiting from the drivers side after it was parked at 10 PadelFord Street." This person was subsequently identified as Russell Yates. Now, unless the defendant and his alleged associate "Understanding" can shape shift, then what Macon testified to is a complete prevariacation on his part. Furthermore, Weems' counsel had this police report, totally and completely rebutting Macon's testimony. Why he never utilized it is not known, especially after Weems informed him of this, but considering the major devastating and disastrous effect that Macon's testimony had upon the defense (that Weems possessed the firearm during an episode that never took place)

Weems' counsel's non use of the police report or of the letter from the prosecution detailing Macon's proposed testimony, can in no way, form, or fashion be considered strategic. Thus, Weems' counsel was patently ineffective.

As stated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80, L. Ed.2d 674 (1984), prejudice exists in a particular case when there is "a reasonable probability that, but for counsel's unproffessional errors, the result of the proceeding would have been different. Id., 466 U.S. at 694, 104 S. Ct. 2052. A reasonable probability is one "sufficient to undermine confidence in the outcome." Id. On one end, it is not enough to show that the errors had "some conceivable effect on the outcome." Id., at 693, 104 S. Ct. 2052. Nor is it required, however, that Weems prove that th errors were more than likely than not to have affected the verdict. Id. It is important to maintain the focus of an ineffectiveness inquiry on the "Fundamental Fairness of the proceeding." Id., at 696, 104 S. Ct. 2052.

Three factors need to be considered in this case in order to make the prejudice determination. The first is the strength of the government's case against Weems. Second, the effectiveness of the presentation of Weems' defense absent the impeachment documents, must be evaluated. Third, the potential impeachement value of the two documents in undermining the credibility of Macon's testimony, must be considered.

Turning to the impeachment value of the two documents, United States Attorney Brown's letter potentially suggests that Macon was committing perjury on the stand, concerning when Detective O'Mara goes to court with him. It further suggest that Detective O'Mara committed perjury as well, concerning his testimony as to whether he went to court with Macon. This is potently supported by the state prosecutor stating that Detective O'Mara notified him/her that Macon was cooperating with law inforcement, which Detective O'Mara said he did not do. ("I never responded to the Court"......Appendix I, 10-18-01 (Day III, pg. 115, line 11). Now, unless the state prosecutor is lying, which he/she has absolutely no motive to, or nothing to gain by doing so, then Detective O'Mara flagrantly perjured himself on the stand, or at the very least obstructed justice by lying to Weems' counsel and /or the United States Attorney as to what he planned on testifying to. Furthermore, Patrolman Pereira testified to the fact that the other black male that Macon said ran from the car, was never ever identified as Ike Weems. Patrolman Pereira also testified, and wrote in his November 6, 2000 report, that Eunique Wilson (A female) was the driver of the car when Yates was arrested and there was no "car chase" where Weems jumped out with a gun and ran. Impeachment of Macon with the letter and the police report could have created a suspicion inthe jurys mind that Macon was not being honest in his testimony. The jury might have concluded from this, however, that macon would falsely implicate Weems. There is a definite distinction between testifying to cover governmental substantial assistance obligations and Macon lying under oath to help the government

color Weems as a bad man who possessed firearm which he was on trial for.

It is evident that Weems' counsel's failure to utilize thetwo documents to impeach Macon's testimony, severely prejudiced the defense. Nevertheless, it is understandable that it may be a close-call determination for the district court to make, concerning this allegation. It should be noted though, that the district court has the best perspectivein evaluating the possible impact of these two documents on the jury and its verdict. Especially, in a case such as this, where the strength of the government's case rests largely on the credibility of the cooperating witness, the trial judge has had a unique opportunity to form a judgement about the value of Macon's testimony.

As such, it is requested that the district court conduct a fulland fair hearing to evaluate the possible prejudicial effect of Weems' counsel's alleged error in not using the two documents to impeach Macon. If the district court finds that prejudice is absent, it is urged that the district court explain its conclusion given the closeness of the question as it has been identified. The District court should hold a hearing to determine whether Weems' counsel's conduct met the standards articulated in Strickland for reasonable effective assistance.

(6) Weems Concedes to Prosecutions Objection In Claim (6) pg. 24 of Government's Memorandum of Law

(7) Trial Counsel Was Ineffective in Failing To Advise The Court That Weems Observed A Juror Sleeping

Weems' counsel was definitely ineffective in not reporting to the Court that Weems had observed a juror sleeping during trial. The United States Attorney's speculation as to why the alleged juror had his/her eyes closed belies intelligence. She does not know why the juror had his/her eyes closed, and also Weems' counsel not reporting it can not in any way be considered strategic.

It cannot be gainsaid that a fair system for the administration of justice must include the guarantee of "an impartial jury" for the criminally accused. U.S. Const. Amend. VI. See generally, Sheppard v. Maxwell, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed2d 600 (1966); Irvin v. Dowd, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed2d 751 (1961); Stone v. United States, 133 F.2d 70, 77 (6th Cir 1940). If only one juror is unduly biased or prejudiced or improperly influenced, then Weems is denied his Sixth Amendment right to an impartial panel. If the trial court had been informed by Weems' counsel that a juror had been sleeping curing trial, then the court could have taken judicial notice of the fact and held an investigative hearing to determine if the juror's misconduct prejudiced the defense. This is the only way that it could have been determined that the juror sleeping did not infringe on Weems' constitutional guarantee to be tried

by an impartial jury. Because of Weems' counsel's incompetence by him not informing the trial judge of the juror sleeping the amount of prejudice that inhered to the defense because of this is not known. Moreover, any act or omission on the part of Weems' counsel that has any potential of prejudicing the defense, in any degree, cannot be considered strategic. Weems' counsel's primary objective is to protect Weems' constitutional rights, at all costs, within the bounds of the law and ethical conduct. Weems' counsel did not even attempt to do this, by overlooking what Weems brought to his attention about the juror. He could have brought this to the trial judge's attention during a sidebar, out of earshot of the jury, just to be on the safe side and make sure that no harm incurred to him and his client's defense, by the jury being asleep. The fact that he didn't speaks volumes of his indifference to his client's constitutional right to be tried by an impartial jury and of his ineffectiveness..

The United States Attorney attempts to imply that a sleeping juror is an error that is harmless, by stating, "one sleeping juror is not necessarily cause for concern." Artice III, §2, cl. 3 of the Constitution provides: "The trial of all crimes, except in cases of impeachment, shall be by jury..." The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury..." When the district court deals with the content of this

of this guarantee - the only one to appear in both the body of the Constitution and the Bill of Rights - it is operating upon the spinal column of American Demorcracy. William Blackstone, the Framers' accepted authority on English law and the English Constitution, described the right to trial by jury in criminal prosecutions as "the grand bulwark of [Weems'] liberties...secured to him by the great charter." 4. W. Blackstone Commentaries *349 One of the indictments of the Declaration of Independence against King George III was that he had "subject[ed] us to a jurisdiction foreign to our constitution, and unacknowledged by our laws" in approving legislation "[f]or depriving us, in many cases, of the benefits of trial by jury." Alexander Hamilton wrote that "[t]he friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in value they set upon the trial by jury: Or if there is any difference between them, it consists in this, the former regard it as a valuable safeguard to liberty, the latter represent it as the very palludium of free government." The Federalist No. 83, p. 426 (M. Beloff ed. 1987. The right to trial by jury in criminal cases was the only guarantee common to the 12 state constitutions that pre-dated the Constitutional convention, and it has appeared in the constitution of every state to enter the union thereafter. Alschuler & Deiss, A Brief History of the Criminal Jury in the United States, 61 U. Rev. 867, 870, 875, n 44 (1994).

With these historical legal points in mind, the fact that a juror was sleeping during Weems' trial defies harmless-error review

This is because it cannot be said "beyond a reasonable doubt that the error...did not contribute to the verdict obtained." Chapman v. California, 386 US 18 at 24, 17 L. Ed2d 705, 87 S. Ct. 824. It cannot be said beyond a reasonable doubt that the sleeping juror did not contribute to the second trial which resulted in Weems being found guilty. Furthermore, a sleeping juror does infect the entire trial process, (2) necessarily renders a trial fundamentally unfair, and (3) deprives Weems of the basic protections without which a criminal trial cannot reliable serve its function as a vehicle for determination of guilt or innocence. A sleeping juror is "a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself, "Arizona v. Fulminante, 499 U.S. 279 at 310, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991). The error of a sleeping juror is such an error that "infect[s] the entire trial process," Brecht v. Abrahamson, 507 US 619, 630, 123 L. Ed.2d 353, 113 S. Ct. 1710 (1993), and "necessarily render[s] a trial fundamentally unfair," Rose v. Clark, 478 U.S. 570 at 577, 92 L. Ed.2d 460, 106 S.Ct. 3103 (1986). Put another way, the error of a sleeping juror deprives Weems of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence...and no criminal punishment may be regarded as fundamentally fair" Id., at 577-578, 92 L.Ed2d. 460, 106 S. Ct. 3101. All of the aforementioned history and cases strongly support the fact that Weems' counsel indifference to the sleeping juror, after being alerted of him by Weems, means that he was ineffective, especially considering the fact of the potential havoc that a sleeping juror could wreck on the entire trial

process. They also strongly support the fact that a sleeping juror can never be considered harmless error, contrary to what the United States Attorney tries to imply.

In summary, an investigative hearing should be conducted to determine the exact impact of prejudice that Weems' defense suffered due to the juror sleeping during substatial portions of the trial. Understanding that the trial judge may not see the seriousness of allowing a juror to sleep during trial and the dangerous repercussions that can develop because of it, he should keep in mind the wise words of Blackstone: [H]owever convenient [intrusions on the jury right] may appear at first, cast doubtless, all abritrary powers, well executed, are the most convenient,) yet let it be again remembered that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread to the utter disuse of juries in questions of the most momentous concern." 4 Blackstone, Commentaries, 350.

See also Bollenbach v. United STates, 326 U.S. 607, 615, 90 L. Ed. 350, 66 S. Ct. 402 (1946). Formal requirements are often scorred when they stand in the way of expediency. Nevertheless, the federal district court judge, who is the guardian of Weems' constitutional rights, has an obligation to take a longer view into this matter.

(8) <u>Weems Can Demonstrate that His Trial Counsel Acted Unreasonably In Failing To Request A Franks Hearing concerning Factual Discrepancies Between Christopher Macon's Statements and Special Agent Troiano's Statements of What Macon Told Him</u>

Weems' counsel was ineffective because he failed to request a <u>Franks</u> hearing, especially when he was aware of the discrepancies between Christopher Macon's statement and Special Agent Troiano's reports in which he recites the information that Macon reported to him.

The United States Attorney attempts to evade the facts that by stating that the basis for Weems' arrest was two outstanding warrants. This, of itself, is true, but Agent Troiano's report, based upon Macon's supposed statements, are the basis of the subsequent Federal warrant for possession of a firearm by a prohibited person (Title 18, Section 922(g)(i), which was served on Weems after he was already in custody pursuant to the two outstanding state warrants. The underlying reason for the Federal warrant was because of Agent Troiano's false statements, stating that Weems supposedly possessed a firearm that Macon observed him possessing. The statements made by Agent Troiano, were all 100% patently false. This fact is further supported by the fact that there is no other corraborating probable cause evidence to support this information that Agent Troiano used in his report. There are no fingerprints, no surveillance, no photographs of Weems with any firearm, or no other witnesses stating that they ever saw Weems possessing a firearm. The statements made by Agent Troiano in his affidavit were all lies, in order to justify the warrantless search of

11 PadelFord Street and to justify blaming Weems for a firearm which he had absolutely no connection to.

Weems' counsel was fully aware of all the aforementioned allegations, due to many extensive detailed conversations between Weems and his counsel, and also because of the following motions filed by Weems: Motion To Produce Christopher Macon At Hearing To Suppress Testimony Of Confidential Informant, mailed 9/24/01; Motion To Sequest Government Witness, mailed 9/24/01; Motion To Sit As Co-Counsel Hybrid Representation, mailed 10/08/01/ If this, along with conversations with Weems was not enough to convince him that Agent Troiano was lying in his affidavit, then Assistant U.S. Attorney Stephanie S. Brown's notice of Macon's proposed testimony should have alarmed him. In AUSA Brown's notice (8/24/01), she wrote, "I expect Mr. Macon will also testify that he had seen your client with the firearm on several other occasions including about a month before the arrest when Mr. Weems was standing in the yard at PadelFord Street; about a week later when Mr. Weems was walking down PadelFord Street and about three to four days before when Mr. Weems fled as officers tried to arrest him..." In Agent Troinao's affidavit he only writes of the incident with Lexus, but not of all the other times that Macon saw him with a firearm. Also in AUSA Brown's notice she writes: "Mr. macon will also state that he saw two other firearms in the apartment along with some other individuals." Again, Agent Troiano makes no mention of these two firearms that Macon supposedly saw Weems with. Furthermore, if Weems' counsel read the police report concerning Mr. Weems fleeing from a red Lexus, he would have seen that there is no mention of any firearm being possessed by anyone, those who fled or arrested.

This should have piques Weems' counsel's interest, along with the many times that Weems told his counsel that Agent Troiano was lying, and caused him to request a Franks hearing.

If Weems' counsel would have requested a Franks hearing it would have shown that Agent Troiano's statements in his affidavit were knowingly and intentionally false, and that these false statements were the only probable cause that the ATF could manufacture to justify requesting that a warrant be lodged against Weems. If Weems' counsel would have requested a Franks hearing, and one was granted and conducted, the truth concerning Agent Troiano's fabrications would have been readily apparent before the court, and would have quashed the basis for the federal warrant. Because Weems' counsel did not request a Franks hearing his inaction directly allowed Weems to be prosecuted pursuant ot a pleading which was based on 100% totally false information. By not requesting a Franks hearing, Weems' counsel directly violated Weems' excercise of his Sixth Amendment constitutional right to confront his accuser, who in this case was the lying Special Agent Troiano.

In the case of United States v. Valerio, 48 F.3d 58 (1st Cir. 1995), the same district court judge who is presiding over Weems' case allowed defendant Baez to be given a Franks hearing, with a lot less to base his claim of the agent lying, to determine if the confidential informant, whose statements were used by the affiant, actually existed, which Baez contended. In the instant case a Franks hearing was feasible, and Weems' counsel's failure to request one can in no way be considered stratigic.

Weems made the necessary showing that Special Agent Troiano's statements in his affidavit were knowingly false and displayed Special Agent Troiano's reckless disregard for the truth, and that Special Agent Troiano's false statements were the only findings necessary to the finding of probable cause for the Federal warrant, to his counsel, an officer of the court. Weems' counsel, armed with all of the key information that he had access to, to show and prove that Special Agent Troinao was a paid liar for the government, should have requested a Franks hearing to be conducted for Weems. This would have been quashed, once it was shown how of a lier that Special Agent Troiano is. The fact that Weems' counsel did not request a Franks hearing allowed the matter to remain in darkness, and for prosecution to begin against Weems for which there is no factual basis. This violated Weems' Constitutional and substantial rights, thus he was prejudiced because of his counsel's failure to request a Franks hearing as he was directed to do by Weems. (see exhibit H,F&G).

(9) Weems Counsel Did Render Ineffective Assistance In Failing To Object To Jury Instructions On The Search And Constructive Possession

Weems next claim of ineffective assistance of counsel relates to his counsel's failure to object to the court instructing the jury on the law of constructive possession. Weems maintains that Special Agent O'Shaughnessy's testimony eliminated

the possibility that the jury could find him guilty of possession of a firearm on any theory other than on of actual possession. Weems can only be found guilty of evidence introduced at trial, and the only evidence Government introduced was that Weems actually possessed firearm. In addition, Weems maintains that his counsel should have objected to the court's instruction regarding the search, which undermined Weems theory of defense.

The Court Instructed the Jury:

> And you've heard conflicting evidence in this case about whether Government agents searched 11 PadelFord Street or Padelford Street, I guess It's pronounced, whether the Government Agents searched 11 Padelford Street of the time that Mr. Weems was arrested and whether they caused any damage to the property. That evidence is relevant only to the extent that it may bear on your decision as to whether Mr. Weems actually possessed the firearm that had been introduced in evidence as Governments Exhibit 1.

Tr. of October 19, 2000, at 53,

Weems submits that the instruction impermissibly limited the jury's consideration of permissable evidence and undermined the theiry of the defence.

> The defendant contends that he did not possess the firearm, but, instead, that The firearm was found during a search of the apartment after he had been arrested...(Defense theory jury charge)

Tr. of October 19, 2001, 53-54.(See exhibit I )

There was a great deal of dispute about the search in this case. The testimony about the search was therefore probative, not just on the issue of actual possession of the weapon, per se, but also on the issue of the credibility of the law enforcement officials who executed the search.

Shortly after giving the above instruction, the court told the jury:

> So the firearm is properly part of the evidence in the case and it's not up to you to decide whether It was seized legally or not seized legally. The issue for you to decide is simply whether Mr. Weems possessed the firearm, either actually or constructively.

Tr. of October 19, 2001, at 54

Particulary troubling is the phrase, "so the firearm is properly part of the evidence in the case..." This instruction could have been construed by the jury that the firearm is "properly part of the evidence" because the court has already decided ("It's

not up to you to decide..") the Agents didn't search house for firearm after Weems was arrested. These instructions, which were not given at first trail where Weems trial ended in hung jury, could very easily have been misunderstood by the jury. The theory of the defense was that the officers found gun during a search of the house after he was arrested and then placed on the boxspring. Weems never argued the firearm wasn't "properly part of the evidence".

> After the Government has presented Its evidence as to each element, and the defendant has had the opportunity to present a defense, if the defendant so chooses, the judge must instruct the jury on the law applicable to the issues raised at trial...Under the Sixth Amendment Jurisprudence, the next two steps are strictly for the jury...consequently, a trial judge commits error of constitutional magnitude when he instructs the jury as a matter of law that a fact essential to conviction has been established by the evidence thus depriving the jury the opportunity to make it's finding.

U.S. v. Johnson, 71 F.3d at 142 (4th Cir 1995)

Weems submits that the effect of the court's instruction was to remove one fact from the jury's consideration, to wit, the fact of the firearm. This court has said:

> Plainly, an instruction that removes from the jury's consideration one of the essential elements of a crime cannot stand. Jury Instructions cannot deprive a criminal defendant of his or her constitutional rights to have a jury determine beyond a reasonable doubt his guilt of every element of the crime with which he is charged.

U.S. Dirico, 78 F.3d at 735 (1st Cir. 1996) Quoting Gaudin, at 115 S. Ct. 2320.

In this case, the government had to prove a weapon was possessed and this instruction relieved the government of that obligation.

The court also instructed the jury that the defendant could be found guilty based either on actual possession or constructive possession. With respect to constructive possession, the court told the jury:

> If all three requirements are satisfied and the firearm is not on the defendant's person or not within his immediate reach, but he nevertheless has the ability and the intention to exercise control over the firearm, then, the

> defendant, or a defendant is said to have constructive possession of the firearm. So, in either case, the defendant must have some control over the firearm.

Tr. of October 19, 2000, at 51-52

Prior to jury instruction Weems informed counsel to object to this instruction because there was no evidence to support a charge of constructive possession. Agent O'Shaughnessy's testimony eliminated any such instruction. O'chaughnessy testified that there was no gun on matress or boxspring prior to Weems falling onto bed from ceiling. i.e., the gun was actually possessed by Weems when he fell from ceiling. Counsel's performance prejudiced defense thus preventing a fair trial. The jury was told it could convict Weems on eitherof two theories, actual or constructive possession. Where the Government had only produced evidence of actual possession. When there is a general verdict and the jury's verdict could be based on an insufficient ground, the verdict must be set aside. United States v. Norton, 808 F.2d 908, 911 (1st Cir. 1987), citing, inter alia, Zant v. Stephens, 462, U.S. 862, 881, 103 S. Ct. 2733 (1983).

Due to WEEMS ineffective assistance of counsel at this second trial, WEEMS conviction should be reversed.

(10) Weems has made out a claim of Ineffective Assistance of Counsel on his claim that after his counsel fainted he failed to call important facts witness and cross-examine trial witnesses on important facts which could have shown his actual innocence.

The Government stated in its objection, "It is virtually impossible to assess the merits of Weems' claim because he was not identified the facts witness who he contends his counsel should have called and about what he or she would have testified..." pg 32. Weems has made effort to locate these witnesses and obtain a statement to support this claim. The basis of this claim revolves around agents and officers fabricating evidence and Weems fears that if he shares this information at this date, before he obtains any statements from witnesses, the Government will be able to prepare the witnesses. Out of an abundance of caution Weems has included this claim so he wouldn't be barred from presenting these witness statements or affidavits at a later date.

(11) Weems Can Make Out a Claim of Ineffective Assistance of Counsel on his Claim that His Counsel Failed to Seek to Vacate His 1988 Assault Conviction.

Weems would like to preserve this issue for argument at a later date due to the following reasons:

1) Due to the fact that he is at a federal institution and is a Federal prisoner, he does not have access to Rhode Island General Law. Weems needs this in order to adequately argue his claim.

2) Furthermore, he does not have immediate access to the plea hearing transcripts, which would help him substantiate his claim.

3) Moreover, Weems needs more time to research state and federal case law concerning this claim. Being that the circuit courts are split on the issue of the date on which petitioner should raise the facts supporting his claim to vacate state conviction which formed basis for enhancement as a career offender. (Compare Brackett v U.S., 270 F. 3d 60 (1rst Cir) to Gadsen v U.S. (4th Circuit). Weems request more time to exercise due diligence to argue his

claim.

Inclusion, Weems respectfully request that this court allow him to argue this issue at a later date, and not consider this claim time or procedually barred after exercising due diligence to argue this claim.

(12) Weems' Due Process Rights Were Violated By Use of Prior Convictions At Sentencing Which Were not Proven to a Jury Beyond a Reasonable Doubt.

Concerning whether the Teague doctrine applies to the retroactive use by Weems applying the recent Apprendi based Blakely decision to his case on collateral review, new rules of constitutional law will not be applied or announced in criminal cases on collateral review, except where new rule (1) places class of private conduct powers of state to proscribe or address substantive categorical guarantee accorded by Federal Constitution, or (2) is watershed rule of criminal procedure implicating fundamental fairness and accuracy of criminal proceeding holding; constitutes new rule if it breaks new ground, imposes new obligation on states or Federal Government, or was not dictated by precedent existing at time defendant's conviction became final; decision announces new rule if decision expressly overrules prior decision. See Graham v Collins (1993) 122 L. Ed. 260, 113 S.Ct. 892.

To apply doctrine expressed in Teague v Lane (1989) 489 US 288, 103 L. Ed. 2d 334, 109 S.Ct. 1060, that in general, new federal constitutional rules of criminal procedure will not apply to cases that have become final before new rules are announced, federal habeas court (1) determines date upon which conviction of accused, who is seeking to reply on particular constitutional rule, became final, (2) must survey legal landscape as it then existed and determine whether court considering accused's claim at time conviction became final would have felt compelled by existing precedent to conclude that rule on which accused seeks to rely was required by Constitution, and (3) if it is determined

that habeas corpus petitioner seeks benefit of new rule, must consider whether relief sought falls within one of two narrow exceptions to nonretroactivity; however, exceptions are (1) to permit retroactive application if rule places class of private conduct beyond power of state to proscribe or addresses; substantive categorical guarantee accorded by Constitution, and (2) for watershed rule implicating fundamental fairness and accuracy of criminal proceeding. See Lambrix v Singletary, (1997) 137 L. Ed. 2d. 771, 117 S.Ct. 1517.

Even though Weems' sentence was final before Blakely v Washington, 124 S.Ct. 2531 (2004) was decided, there is no retroactive bar or preclusion from its use in this 2255 motion because allBlakely did was clarify the Apprendi rule, which implicated fundamental fairness and accuracy of criminal proceedings. Furthermore, Blakely did not expressly overrule any prior decision. Blakely did not impose any new obligations on the Federal government, that was not already existent under the Apprendi rule. Also, absent the press coverage that the Blakely case has received in media, Blakely did not break any new ground that Apprendi did not already break in 2000. With these facts in mind, it is clearly apparent that Blakely applies to the case at hand.

In light of the Supreme Court's decision in Blakely v Washington, 124 S.Ct. 2531 (2004), the sentence which the district court imposed pursuant to the United States Sentencing Guidelines violated Weems' Fifth Amendment right to grand jury indictment and Sixth Amendment right to trial by jury. The Blakely Court held that in order to increase a defendant's sentence beyond the presumptive sentencing guideline range set under the [U.S.S.G.'s] scheme (as opposed to the higher maximum term of imprisonment set by statute for the offense of conviction), either a defendant must admit as part of a guilty plea, or a jury must find beyond a reasonable doubt, the facts giving rise to the increase. The absence of either an admission or a jury finding violates the defendant's "Federal constitutional right to have a jury, determine beyond a reasonable doubt all facts legally essential to his sentence." 124 S.Ct. at 2536.

Applying Blakely to Weems' case, he cannot be classified as an armed career criminal and cannot receive an enhanced level and criminal history category pursuant to U.S.S.G. § 4B1.1. The fact of the prior convictions used to classify Weems as an armed career criminal was neither alleged in the indictment against him, nor found by the jury beyond a reasonable doubt. The career criminal requires factual determinations that go well beyond the mere fact of prior conviction, and as a result, the enhancement is subject to the rule of Blakely. Thus, because the facts giving rise to the enhancement both the offense level and the criminal history score were neither alleged in the indictment nor found by the jury beyond a reasonable doubt, the sentence must therefore be recalculated.

As applied to Weems' case, the sentence imposed by the district court violated his constitutional rights in two ways. First, it violated his right to indictment by grand jury because the facts giving rise to the sentence he received were not alleged in the indictment. Second, the sentence imposed Weems also violated his right to jury trial under the Sixth Amendment.

For Weems to be sentenced as an armed career criminal and given an enhanced sentence for violation of 18 U.S.C. § 922(g), U.S.S.G. § 4B1.4, Application Note 1 requires proof of three facts:

(1) that Weems was at least 18 years old at the time that he committed the instant offense;

(2) that Weems had at least three violent felony or serious drug offenses, as prior convictions;

(3) that Weems, in fact possessed a firearm or ammunition, after at least three prior convictions consisting of either violent felonies or serious drug offenses.

Weems' Presentence Report found that he had the following three prior convictions:

1) income derived racketeering, possession with intent to distribute controlled substance, conspiracy to violate controlled substances act;

2) assault with a dangerous weapon;

3) assault with a dangerous weapon.

In Weems' indictment, the grand jury charged only that he had a prior conviction. Furthermore, the government presented evidence regarding the prior conviction at trial. However, this prior conviction alone was not enough to classify Weems as an Armed Career Criminal. No other prior conviction was either charged in the indictment, or proved to the jury beyond a reasonable doubt. Furthermore, Weems' age was also never charged in the indictment, or proven to the jury beyond a reasonable doubt.

Thus, the indictment did not allege the facts giving rise to the enhanced offense level applied at sentencing, and the jury did not not find these facts beyond a reasonable doubt. Basing the sentence upon them therefore violating Weems' right to indictment, and his right to have such facts proven to a jury beyond a reasonable doubt.

After Blakely, it is clear that these enhancements were wrongly applied. No judge or jury made an express finding, much less a finding beyond a reasonable doubt, that Weems had three qualifying convictions. Furthermore, there was also no express finding beyond a reasonable doubt of Weems' age. Therefore Weems right to indictment and to have a jury determine beyond a reasonable doubt the facts essential to his enhanced sentence were violated, and his offense must be reduced accordingly.

Weems also challenges the calculation of his criminal history category as violating Blakely because that calculation required findings of facts that were not alleged in the indictment and were not found by a jury beyond a reasonable doubt. He recognizes that Blakely, in extending the rule of Apprendi, excepted "the fact of a prior conviction" from the rule that any fact that increases the penalty, for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

124 S.Ct. at 2536. Under the United States Sentencing Guidelines, a defendant receives criminal history points under Chapter Four based on numerous determinations that go well beyond the mere "fact of a prior conviction."

For example, in Weems' case, he was classified as an Armed Career Criminal, and as a result, his criminal history category was enhanced to Six. He received this enhanced criminal history category based upon the existence of facts such as the age of 18, and the existence of at least two prior qualifying convictions. (See U.S.S.G. § 4B1.4(a) Application Note 1). Thus, the imposition of armed career criminal enhancement under U.S.S.G. § 4B1.4(a) Application Note 1 required the district court to make determinations that went beyond the simple existence of a prior conviction.

In short, it is clear that the factual determinations required to enhance Weems' offense level and criminal history category trigger the Rule of Blakely. Accordingly, because the facts supporting the enhancements and the criminal history calculations were neither alleged in the indictment nor found beyond a reasonable doubt by a jury, the calculation of Weems offense level and criminal history category violated his Fifth and Sixth Amendment constitutional rights, as outlined above. This court should therefore correct and reduce his sentence accordingly, in line with the Supreme Courts holding in Blakely.

(13) Weems Can Maintain His Present Challenge that His Conviction Was Obtained By Use of Evidence Obtained Pursuant to an Unconstitutional Search and Seizure.

Under Stone v Powell,"where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted Federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial" 428 U.S. at 494, 96 S.Ct at 3052 (Footnotes omitted). Weems'constitutional claims, although relating to evidence arguably protected also by the Fifth Amendment, were based on Fourth Amendment considerations articulated in

Chimel v California, 395 U.S. 752, 23 L. Ed. 2d 685, 89 S.Ct 2034 (1969). Chimel v California, declared that "[t]he search here went far beyond [Weems'] person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area. The scope of the search was, therefore, "unreasonable" under the Fourth and Fourteenth Amendments, and [Weems'] conviction cannot stand." 395 US at 768, 23 L. Ed. at 697. Therefore the threshold issue both in the district court and in his prior appeal is whether Weems was afforded an "opportunity for full and fair litigation" within the meaning of Stone. Based upon the lack of consideration by the district court and the circuit court of Weems' arguments in reliance upon a United States Supreme Court case almost directly on point, this means that any opportunities which the aforementioned courts might have provided Weems to litigate this Fourth Amendment claim were not "fair." Consequently, it should be concluded that the district court is not precluded from considering Weems' claims on the merits.

Although Stone announced a verbal standard, it failed to clothe the words "opportunity for full and fair litigation" with any precise meaning. The only hint of meaning is a single, oblique footnote signaling the reader to consult Townsend v Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L. Ed. 2d 770 (1963). Townsend describes when a federal court in a habeas corpus proceeding must hold an evidentiary hearing before conducting a collateral review of a state court's application of law to facts. The case instructs that, when the facts are in dispute, a separate federal evidentiary hearing is required "if the habeas applicant did not receive a full and fair evidentiary hearing in state court." Id. at 313, 83 S.Ct. at 757.

In the instant case, the district court applied the Townsend test to determine whether a full evidentiary hearing was required. One was held. Nevertheless, it seems that the district court concluded, based on the government's memorandum of law, that the facts underlying Weems' propositions were adequately developed during the suppression hearing and during the trial process and that consideration of the propositions required the district court merely to draw legal conclusions from these facts. In other words, the district court found that there had been a full and fair suppression/evidentiary hearing. But the "Full and fair evidentiary hearing" of Townsend is not necessarily coextensive with the"opportunity for full and fair" of Stone.

An increasing number of circuits, believe that Townsend should not be applied literally as the "sole measure" of "opportunity for full and fair litigation." Johnson v Meacham, 570 F. 2d 918 (10th Cir 1978)(percuriam); Mack v Cupp, 564 F. 2d 898, 900-01 (9th Cir. 1977); Graves v Estelle, 556 F. 2d 743, 746 (5th Cir. 1977); O'Berry v Wainwright, 546 F. 2d. 1204, 1211-12 (5th Cir.), Cert denied, 433 U.S. 911, 97 S.Ct. 2981, 53 L. Ed. 2d 1096 (1977); See United States ex. rel. Petillo v New Jersey, 562 F. 2d 903, 906-07 (3d Cir. 1977). In Mack v Cupp, 564, F. 2d at 900-01, for example, the court reasoned that:

the Townsend guidelines, to the extent that they command the actual use of state fact -finding procedures, surpass the requirement of Stone that the state must have extended an Opportunity for the full and fair consideration of Fourth amendment claims. See Pulver v Cunningham, 419 F. Supp. 1221, 1223-24 (S.D.N.Y. 1976). On the other hand, the opportunity to litigate

is broader than the evidentiary hearing with which Townsend was concerned. For instance, it extends to appellate review and other matter unrelated to the need for a state court hearing. (Emphasis in original). This district court should also agree that Townsend is not the sole measure of the meaning of "opportunity for full and fair litigation."

Other courts have focused on the "opportunity"aspect of the Stone standard. In general, issues concerning the "opportunity" element of the standard involve procedural questions, that is, whether federal trial and review procedures afforded Weems an opportunity to raise or litigate his claim, or whether a failure to raise such claim at some stage of trial or failure to make timely objection constitutes a waiver or exercise of opportunity and thus satisfies the requirement of "Opportunity for full and fair litigation ." See e.g. Gates v Henderson, 568 F. 2d. 830 (2d Cir 1977) (enbanc), 32 Cert. denied, 434 U.S. 1038, 98 S.Ct. 775, 54 L. Ed. 2d 787 (1978); Tisnado v United States, 547 F. 2d. 452 (9th Cir 1976).

"Opportunity for full and fair consideration" includes, but is not limited to, the procedural opportunity to raise or otherwise present a Fourth Amendment claim. (This premise is further supported by the fact that although the Court announced its holding in terms of "full and fair litigation," 428 U.S. at 494, 96 S.Ct. 3037, its opinion repeatedly spoke of "full and fair consideration," Id at 486, 489, 96 S.Ct. 3037, 3050. The Court's use of the words "consideration" and "litigation interchangeably" suggests that in some instances more than procedural opportunity to raise and litigate a Fourth Amendment claim is required. Indeed, consideration

connotes the actual evaluation of a claim under the correct constitutional standard.). It also includes the full and fair evidentiary hearing contemplated by Townsend. Furthermore, it contemplates recognition and at least colorable application of the correct Fourth Amendment constitutional standards. Thus, the district court is not precluded from considering Weems' Fourth Amendment claims in 2255 proceedings where the same district court willfully refused to apply the correct and controlling constitutional standards. Deference to trial court consideration of Fourth Amendment claims does not require federal blindness to the trial court's refusal to apply the appropriate constitutional standard.

In the instant case, it is manifestly evident that the trial court or the circuit court did not recognize or apply the controlling Chimel standards. Chimel was not referred to expressly by name, nor were its factors implicitly incorporated into any circuit court opinion. Not only were the Chimel standards not applied, but the very standard Chimel resected, namely, that in the absence of a search warrant, there was no constitutional justification for extending the search beyond Weems' person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him, thus the scope of the search was unreasonable under the Fourth, Fifth, and Fourteenth Amendments, and that Weems' conviction could not stand.

The most significant indication that Chimel was not applied is the fact that the post state warrant arrest fruits of the warrantless search - the firarm-actually was admitted as evidence. Even when doubts as to the application of Chimel factors to the facts of this case are resolved in the government's favor, it is transparent that the primary taint of the challenged evidence was not purged. The search and seizure of the residence where Weems was arrested at took less than an hour to commence. There were no intervening circumstances

or breaks in the casual chain between the arrest and the illegal search and seizure. Although a valid search warrant might have purged evidence found in the general search of the residence of its primary taint, the search warrant would not have authorized the subsequent federal warrant, especially considering that there was no other evidence linking Weems to the illegally seized evidence. Consequently, a search warrant could not have purged of primary taint the false statements made by Agent Troiano in his affidavit, supporting the subsequent federal arrest warrant, used to justify and/or cover up the reason for the illegal search.

It should also be stressed that the police conduct throughout the episode in question was egregious, constituting the sort of flagrant misconduct relevant under the Chimel standard. The officers and agents engaged in this artifice to simplify the burden of proving that Weems possessed a firearm and also that he controlled any contraband that might be found during the search. In view of such outrageous misconduct, it is inconceivable that the district trial court could have applied the Chimel standard and reached the conclusion that they did. Therefore, consideration of Weems' Fourth Amendment claim is not barred by Stone.

An application of Chimel requires the exclusion of the firearm and other evidence tainted by the illegal search and seizure. Under the above mentioned facts, the taint was not subsequently purged by the existence of a valid warrant or even by the serving of two outstanding state warrants. Thus, Weems should have his claims heard.

## VI. Conclusion

Based upon the foregoing reasons, Petitioner respectfully requests that the court grant Weems § 2255 motion.

Respectfully submitted

I. Weems

Ike Weems, Pro-Se
U.S.P. Big Sandy
P.O. Box 2068
Inez, Ky 41224

DATED: 2-13-05